# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2011 Session

## STATE OF TENNESSEE v. REBECCA ANN GALYEAN

**Direct Appeal from the Criminal Court for Putnam County**
**No. 09-0008     Leon Burns, Judge**

---

**No. M2010-01003-CCA-R3-CD - Filed October 13, 2011**

---

The Defendant-Appellant, Rebecca Ann Galyean, was convicted by a Putnam County jury of one count of vehicular homicide by intoxication, a Class B felony,[1] two counts of vehicular assault by intoxication, a Class D felony, and two counts of driving under the influence, a Class A misdemeanor. The trial court merged the convictions for driving under the influence into the conviction for vehicular homicide. The Defendant-Appellant received an effective eleven-year term of imprisonment in the Tennessee Department of Correction. In this appeal, the Defendant-Appellant presents the following issues for our review: (1) whether the trial court erred by admitting evidence that the Defendant-Appellant's blood analysis tested positive for "less than 0.25 µg/ml" of Tramadol; (2) whether the trial court erred by not declaring a mistrial based on the removal of Defendant-Appellant's mother from the courtroom during trial; and (3) whether the trial court imposed an excessive sentence. Upon our review, we affirm the Defendant-Appellant's convictions; however, we conclude that the trial court erroneously sentenced her beyond the statutory maximum for vehicular assault. Therefore, we modify the Defendant-Appellant's sentences for vehicular assault to four years, the maximum in the range, and remand to the trial court for entry of corrected judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

William A. Cameron, Cookeville, Tennessee, for the Defendant-Appellant, Rebecca Ann Galyean.

---

[1]The judgment form for this conviction erroneously lists the conviction offense as T.C.A. § 39-13-213(a)(1), a Class C felony. However, the Defendant-Appellant was charged with, convicted of, and sentenced for vehicular homicide by intoxication, a Class B felony under T.C.A. § 39-13-213(a)(2).

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Randall York, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case involves a fatal car crash in which the Defendant-Appellant drove her car "head-on" into oncoming traffic on the interstate, colliding into the car of Larry and Dorothy Schrock, two of the victims in this case. As a result, Larry and Dorothy Schrock were seriously injured, and Donald Meese, the front-seat passenger in the Schrocks' car, was killed.

**Trial.** Larry and Dorothy Schrock, a husband and wife team from Winchester, Virginia, owned a tour company that conducted motor-coach tours across the United States. Larry Schrock testified that on October 16, 2008, as part of a tour, they stopped in Memphis, Tennessee. They had been notified that their brother-in-law had passed away and arranged to return to Virginia for the funeral. Their office sent additional drivers to Memphis to relieve the Schrocks from the tour and another driver, Donald Meese, to assist Larry Schrock on the return drive to Virginia. When they left Memphis, Donald Meese was driving, Mr. Schrock was in the front passenger seat, and Mrs. Schrock was in the back seat. Other than getting into the car to return to Virginia, Mr. Schrock could not remember anything regarding the accident. Forty days later, he awoke from a coma in the hospital.

Mr. Schrock's injuries included a concussion, blood on his brain, and lacerations. He also suffered a broken neck which caused his "eyes to cross," deafness in his left ear, and vocal cord replacement. He had an operation on his left eye, and his hip was broken. All of his ribs on his right side were broken, as well as his knee. Mr. Schrock explained that his wife had also been in a coma for forty-four days. Mr. Schrock said his wife suffered "terrible head injuries, lacerations, and she lost her left eye totally, and her eye socket was all broken out." Mr. and Mrs. Schrock were in the hospital rehabilitation center an additional two weeks before returning home. Mrs. Schrock was unable to be present at trial because she was undergoing her fourth eye surgery as a result of the accident. The operation was to provide Mrs. Schrock with a prosthetic eye and to reconstruct her eye socket. Mrs. Schrock had a total of four surgeries as a result of the accident and anticipated at least two additional operations.

John Cecil Hamilton, a tractor-trailer driver, was the first person to respond to the collision. He was heading westbound on I-40 toward Nashville at approximately 3:00 a.m. the morning of the crash. Other truck drivers had previously communicated on the radio that a car had just "gone the wrong way" at mile marker 288. Hamilton did not hear which way

the car was going and was "on the look out" because he did not know if the car was coming toward him or whether it was on the other side of the interstate. "[R]ight before [mile marker] 287," Hamilton observed smoke and sparks. He stopped his truck, grabbed his fire extinguisher, and ran across the median to the crash scene.

In less than four minutes, Hamilton approached a Saturn and observed that the passenger's window was broken. He felt for the passenger's pulse and believed the passenger to have died on impact. He ran to the driver's side and the door was jammed. At this point, Hamilton stated another person was on the scene attempting to help the victims. Hamilton went to the rear passenger window and confirmed that a woman was in the back seat. He said:

> Her false teeth were half way in and out of her mouth. Her skull was laid open, and down through her face was laid open. And she was moving her head back and forth, and we were trying to get her to hold her head still until somebody got there.

Although the woman was conscious, she was mumbling and Hamilton could not understand her. Hamilton confirmed that Larry Schrock was driving the Saturn, but was not conscious. He could tell that Mr. Schrock's neck was broken, "just by the way his head was laying over, and his legs was [sic] crumbled up pretty bad." Paramedics responded within minutes and, after observing the other car to be a Cadillac, Hamilton left the scene.

Billy Harris, a paramedic with the Putnam County Ambulance Service, responded to the scene of the offense in this case. Other emergency response units were already on the scene when he arrived. He observed "a car in the median, and . . . a car sitting in the middle of I-40." He went to the car that was still on the interstate, the Cadillac, and assisted the female patient, later identified as the Defendant-Appellant, to the ambulance. Harris stated that the Defendant-Appellant was awake and alert. He noted the smell of "ETOH," a term used to indicate that the accident could be alcohol or diabetes related. The Defendant-Appellant told the paramedics that she had been to the Hawg Barn and had five to six cans of beer.

According to Harris, the Defendant-Appellant could not remember that she had been in a car accident. Harris did not observe or treat any head injury of the Defendant-Appellant. Based on the number of drinks the Defendant-Appellant had consumed, the smell of alcohol, and the lack of a head injury, Harris opined that the Defendant-Appellant "probably had too much alcohol." She was transported to the hospital. Harris returned to the scene and confirmed that the front-seat passenger of the vehicle, Donald Meese, was dead. On cross-examination, Harris agreed that it was "not unusual" for a person not to remember what happened after having been involved in a serious car accident.

Officer Chris Melton with the Cookeville City Police Department was the second officer to respond to the scene. He assisted Sergeant Johnson in assessing the condition of the passengers in the Saturn. He was present when Meese's body was removed from the car and said Meese's body was "like a bag of jello."

Sergeant Jeff Johnson of the Cookeville City Police Department was the first emergency officer to respond to the scene. He went to the car that was in the median and initially observed two subjects inside. He stated that the person on the passenger side appeared to be deceased. He said civilians were attempting to help get the victims out of the car. He tried to make contact with the driver, assure him that they were trying to help him, and stabilize the car. He said the driver's condition was critical. He also confirmed the female in the rear of the car was "very severe." "EMS" arrived shortly thereafter and took over the scene. He was also present when the front-seat passenger was removed from the car. He described the passenger's body:

> It would be like his - - he didn't have bones anymore. He was pretty much just like - - it would be like you saw a scarecrow, or something where the legs had been stuffed, maybe like sand bags. I mean it didn't appear that he had any bones left in his lower extremities.

Trooper Allen England responded to the scene and after being advised of the situation, confirmed that the Defendant-Appellant was the driver of the Cadillac. When he stuck his head inside of the Defendant-Appellant's car, he observed the "faint odor of alcohol" emanating from the Defendant-Appellant. He further commented that the Defendant-Appellant's speech was "slow to respond." When the Defendant-Appellant was inside the ambulance, Trooper England stated the odor of alcohol was even stronger. He then confirmed that the occupants of the Saturn were Larry Schrock, Dorothy Schrock, and Donald Meese.

A video initiated by Trooper England's blue lights on his patrol car recorded Trooper England's involvement in the investigation. It was played for the jury and admitted as exhibit one. On the recording, the Defendant-Appellant admitted to having drunk six or seven beers that night. Various photographs of the scene showing the condition of the cars were admitted into evidence as exhibits two through nineteen. Exhibit twenty was a photograph of the victim, Donald Meese, after he had expired.

Trooper England observed the Defendant-Appellant for approximately two to three minutes. Based on the number of beers she had admittedly consumed and the odor of alcohol, England opined that the Defendant-Appellant was "under the influence." He also said that her eyes were "red and watery," and that her speech was "very low, and, . . . kind of slow to respond." He then notified his supervisor and the Critical Incident Response Team

-4-

(CIRT) because he believed he had a vehicular homicide. He requested Trooper Todd Logan to follow the Defendant-Appellant to the hospital and witness hospital personnel draw her blood.

Sergeant Kevin Norris with the Tennessee Highway Patrol and a supervisor of CIRT testified that he was called to the scene. Upon his arrival, the victims were no longer on the scene. He took several photographs of the crash, went to the hospital, and advised the Defendant-Appellant of her Miranda rights. Defendant-Appellant waived her rights and provided a statement, which was video-taped. The tape was played for the jury and admitted into evidence as exhibit twenty-two. In her statement, the Defendant-Appellant said that she did not remember anything about the wreck. Prior to the collision, she had been at Jim's Inn, where she had "probably two, three beers and a Jager Bomb, I think." She had arrived at Jim's Inn at 11:00 p.m. or 12:00 a.m. and left at "2 something." Before she went to Jim's Inn, she was at the Hawg Barn. She said she arrived there between 5:00 and 5:30 p.m. She "had one, maybe two [beers] at the most" while there. Her car had been performing normally before the wreck.

On cross-examination, Norris stated that there was evidence that the Defendant-Appellant and Donald Meese were wearing seat-belts at the time of the collision. However, there was no indication that the Schrocks were wearing seat-belts. He also confirmed that his "speed analysis" report of the crash showed the Defendant-Appellant traveling at 73 miles per hour and the Schrock car traveling at 64 miles per hour. Finally, Norris described the crash as a "high-speed, head-on collision."

Trooper Todd Logan with the Tennessee Highway Patrol responded to the scene of the collision. He followed the Defendant-Appellant to the hospital to obtain a blood sample. He arrived at the hospital, filled out the necessary paperwork, and requested a nurse technician to obtain the blood sample. He observed the nurse draw blood from the Defendant-Appellant's arm into a vial. He then placed the vial of blood in a clear plastic bag with bubble wrap, along with his paper work inside of a white box. He placed his initials on the box and sealed it. He delivered it to the Cookeville Police Headquarters and placed it into a secure evidence locker. The form placed in the box was admitted into evidence as exhibit twenty-four. While he observed the Defendant-Appellant, Trooper Logan believed that she was intoxicated. On cross-examination, Trooper Logan recalled that two vials of blood were taken from the Defendant-Appellant.

Lieutenant Kendall Riley with the Tennessee Highway Patrol testified that he took the evidence submitted by Trooper Logan and transferred it to the Tennessee Bureau of Investigation (TBI) crime laboratory in Nashville, Tennessee. The box remained sealed while in Lieutenant Riley's possession.

Dawn Swiney, a forensic scientist with the TBI toxicology section, testified that she analyzed the Defendant-Appellant's blood sample provided to her by the Tennessee Highway Patrol. She verified that the Defendant-Appellant's blood had 0.16 grams of ethyl alcohol. A copy of her report was admitted into evidence as exhibit twenty-five.

John Harrison, a forensic scientist with the TBI toxicology section, testified that he conducted a toxicology screen of the Defendant-Appellant's blood sample in this case. He explained that the screen could detect up to "120 different types of drugs." He stated that he used a gas chromatograph for the toxicology analysis and a mass spectrometer to determine the match for the drugs. He found the Defendant-Appellant's blood sample to contain less than .25 micrograms per milliliter of Tramadol. He said that he could only report a drug "down to the lowest level of [his] control, and [his] lowest level of control [in this case] was a .25." He actually measured .23 micrograms per milliliter, and Harrison was certain that Tramadol was present in the Defendant-Appellant's blood. However, he could not quantitate it with certainty below the .25 level. Therefore, he was required to report it as less than .25. A copy of his toxicology report was admitted into evidence as exhibit twenty-six.

Harrison stated that Tramadol is a pain reliever. He explained that it was the same thing as a "strong opiate pain [reliever]," however, it was synthetic. Due to the "mental clouding" that it causes, Tramadol is prescribed with a precaution to beware of operating a motor vehicle. He further testified that Tramadol is "prescribed with the warning not to take alcohol with it because it's a central nervous system depressant in itself." On cross-examination, Harrison agreed that he could not testify as to the actual amount of Tramadol contained in the Defendant-Appellant's blood.

Steven Willis was with the Defendant-Appellant at the Hawg Barn at around 7:00 p.m. on the night of the collision. He recalled the Defendant-Appellant's husband brought her supper from Sonic. Although he could not recall how much the Defendant-Appellant had to drink, he saw her drinking alcoholic beverages that night. He stated that the Hawg Barn sold only beer, not mixed drinks. He observed the Defendant-Appellant's demeanor and described her as "normal." He said, "She wasn't staggering or anything. No slurry speech or anything." At some point, they left and went to Jim's Inn, an establishment that served beer and mixed drinks. He observed the Defendant-Appellant socializing with other people. Although she had "a drink in her hand," Willis did not observe the Defendant-Appellant to be under the influence of alcohol.

Willis said he left Jim's Inn with a group of people, including the Defendant-Appellant, at the same time. He waited in the parking lot with the Defendant-Appellant and observed her to be "fine." On cross-examination, Willis conceded that he "probably" consumed both beer and mixed alcoholic drinks. He further agreed that he was "under the influence of alcohol" that night and was not focused on the Defendant-Appellant. Shelly

Willis, Jim Willis's wife, corroborated the testimony of her husband. However, she stated that she was not impaired on the night of the collision. She stated that she did not observe the Defendant-Appellant to be too impaired to drive and would have ridden with the Defendant-Appellant in a car that night.

Vicki Thomas, business partner to Paul Stouder, purchased the Hawg Barn on the afternoon of the collision. Thomas and the Defendant-Appellant were former co-workers. Thomas was with the Defendant-Appellant at the Hawg Barn on the night of the collision and confirmed that the Defendant-Appellant had a "few beers." She said they went to Jim's Inn because they wanted to know how other bars in town operate. Thomas did not observe the Defendant-Appellant to be impaired in any way. On cross-examination, Thomas acknowledged that she, as the owner of the Hawg Barn, was being sued by the Schrocks, and the issue was whether the Hawg Barn or Jim's Inn "over-served" alcohol to the Defendant-Appellant on the night of the collision. Thomas was aware of a 2006 work accident in which the Defendant-Appellant's hair "got caught up into a piece of equipment and machinery, and it injured her head and her scalp." Paul Stouder, Thomas's business partner and co-owner of the Hawg Barn, testified and substantially corroborated the testimony of Thomas.

Chris Pippin was working as security at Jim's Inn on the night of the collision. He did not know the Defendant-Appellant personally, but had "seen her around." He briefly spoke with the Defendant-Appellant on the night of the collision . She asked him, "What time does the bar close?" During the night, Pippin observed the Defendant-Appellant drink "just a few beers." He also served her three "Jager Bomb[s]," which the Defendant-Appellant gave away to other people. According to Pippin, the Defendant-Appellant was not intoxicated when she left Jim's Inn. On cross-examination, Pippin said that a Jager Bomb is Jagermeister and Red Bull, combined in a shot glass.

Mark Gaylean, the Defendant-Appellant's husband, testified and confirmed that she was seriously injured at work in 2006. He verified that he was with the Defendant-Appellant at the Hawg Barn on the night of the collision. He brought supper to his wife and purchased two beers for her. He left the Hawg Barn between 7:00 and 7:30 p.m. At this point, he did not observe the Defendant-Appellant to be impaired or incapable of driving.

The Defendant-Appellant testified that on the night of the collision she went to the Hawg Barn to celebrate with the new owners of the bar. She drove herself there and arrived around 5:00 to 5:30 p.m. While at the Hawg Barn, she ate some food that her husband brought her. She socialized with friends, played darts, and danced while there. She testified that she drank one beer before dinner, one with dinner, one after dinner, and then part of another beer. The Defendant-Appellant left the Hawg Barn when her group of friends decided to go to Jim's Inn. She drove herself there around 9:00 or 9:30 p.m. She continued socializing at Jim's Inn. She had "at least two beers" at Jim's Inn, and just before she left

there for the night, she had a Jager Bomb. The Defendant-Appellant testified that the bartender mixed the drink very strong, with more Jagermeister than she was accustomed. The drink tasted "nasty," so she finished a beer to remove the taste from her mouth. She then went outside Jim's Inn and talked with her friends before driving away at approximately 3:00 a.m. The Defendant-Appellant testified that she did not feel impaired when she left Jim's Inn. She remembered driving on Highway 111. The next thing she could recall was being awoken by Dale Dyer, a city fireman, and realizing that she had been in an accident. She was then transported to the hospital in an ambulance, and gave a statement to the police later that morning.

On cross-examination, the Defendant-Appellant conceded that she could have drunk the Jager Bomb anytime between 2:15 and 2:45 a.m. No one else witnessed her drinking the Jager Bomb, and in her statement to police, she did not say that she had the drink immediately prior to leaving Jim's Inn. She testified that she had lived in Cookeville all her life, and she was not driving in an unfamiliar part of town leading up to the accident. She could not explain why she was traveling in the wrong direction on the interstate.

Dale Dyer, a fireman for the City of Cookeville, testified that he was close friends with the Defendant-Appellant's father. As a result, he had known the Defendant-Appellant since she was born, and she had grown up around him. On the night of the collision, Dyer was working in his capacity as a fireman and responded to the site of the collision on I-40. He went to the Defendant-Appellant's vehicle and began working to stabilize her spine while other firemen worked to remove the driver's door of her car. When he was questioning her on her condition, the two recognized each other. Dyer testified that he was around the Defendant-Appellant for seven to ten minutes, and that she did not appear to be impaired.

Doctor Opeless Walker, Director of Pharmacy at Cookeville Regional Medical Center, opined that the Defendant-Appellant's blood-alcohol content at 3:00 a.m. was .03 to .06 percent. He testified that he based this opinion on the measured alcohol content of the blood drawn from her at 4:15 a.m., from which he calculated backward to determine the percentage at 3:00 a.m. He testified that he could not speculate what effect Tramadol might have had on the Defendant-Appellant because he did not know the exact quantity of the drug in her blood. Dr. Walker described possible side effects of the drug and said that it should not be mixed with alcohol. He said that it may amplify the effects of alcohol if the drug is present in sufficient quantity, at least .1 micrograms. He also testified that the effects of the drug are diminished after someone has developed a tolerance for the drug, usually within three to six weeks. In Dr. Walker's opinion, the Defendant-Appellant was not under the influence of either alcohol or Tramadol at 3:00 a.m.

## ANALYSIS

**I. Admissibility of Tramadol.** The Defendant-Appellant argues the trial court abused its discretion in allowing John Harrison to testify that she had "less than 25 micrograms per milliliter" of Tramadol in her blood following the accident. Relying on State v. Robert S. Neal, No. M2001-00441-CCA-R3-CD, 2002 WL 31852854 (Tenn. Crim. App., at Nashville, Dec. 19, 2002), perm. to appeal denied (Tenn. May 5, 2003), the Defendant-Appellant contends this evidence was inadmissible because there was no evidence of "when the drug was ingested or when the individual may have been under the drug's influence." As a result, the evidence was irrelevant and unfairly prejudicial to the Defendant-Appellant. In response, the State argues the Defendant-Appellant's reliance on Neal is misplaced; therefore, the trial court properly admitted the evidence relating to Tramadol. We agree with the State.

The Tennessee Supreme Court has generally held, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

This court must apply the abuse of discretion standard when reviewing a trial court's decision regarding the relevancy of evidence under Rules 401 and 402. Dubose, 953 S.W.2d at 652. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting Michael H. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)).

During trial and outside the presence of the jury, the State advised the court that it intended to introduce through Special Agent Harrison that the Defendant-Appellant had less than .25 micrograms per milliliter of Tramadol in her blood. The State argued:

> [Tramadol] is a drug that causes the person who has it in their system some impairment, and we expect Harrison to testify that that is an amplifying effect with the alcohol that would increase the effects of the alcohol and hinder, in effect, the defendant's judgment . . . .

In response, defense counsel argued that this evidence was highly prejudicial because

> The problem is, the State doesn't have the mass spectrometer, the machine to test the amount. All it can test for is the presence, whether it be a trace or a higher level.
>
> . . . .
>
> That could be a .001 or a .10. I mean, under .25, you know. It could be anything, down to practically nothing. And if the State can't prove that it's significant, then it has no probative value.

The trial court determined that the evidence was admissible. It stated:

> Well, I think that the issue would be a case of weight of the evidence. I think the State is allowed to introduce evidence of what was in the Defendant's system. Certainly, questions can be asked by counsel of the State's witness and their own witness as to what influence that might have had upon the alcohol. So, I think it's a weight question as opposed to an issue of being admissible.

In support of this issue, the Defendant-Appellant argues, based on Neal, that the evidence should have been excluded under Tennessee Rules of Evidence 401 and 403, "because the probative effect if any of this evidence was highly outweighed by the prejudicial effect of same." In Neal, the defendant was charged with vehicular homicide by intoxication, among other crimes. Robert S. Neal, 2002 WL 31852854, at *1. This Court held that the trial court did not abuse its discretion in admitting a lab report indicating the presence in Neal's blood of "less than .05 micrograms per milliliter of cocaine." Id. at *14. Neal argued that the report was not relevant because it did not indicate the exact amount of cocaine in Neal's blood or its effect on him. Id. at *16. This Court found the report relevant because the charge of vehicular homicide by intoxication requires proof of the defendant's

-10-

intoxication, and the presence of cocaine in the defendant's blood at the time of the crime was relevant to the issue of intoxication. Id. Additionally, this Court found that the report was not unfairly prejudicial because the amount of cocaine present was not merely a trace amount. Rather, it was an amount the intoxicating effects of which expert witnesses were able to testify. Id. at *18. This Court stated, "This testimony allowed the jury to infer without speculation that the presence of cocaine in the defendant's blood sample supported a conclusion that he was driving while intoxicated." Id.

The Defendant-Appellant argues that Neal supports her case.[2] She provides little further argument as to how the case is supportive. Presumably, she seeks to distinguish Neal and asserts that speculation is required to infer, from the presence of Tramadol in her blood, that she was driving while intoxicated. To the contrary, as the State asserts, Neal supports the admissibility of the evidence. Just as in Neal, the quantity of the drug at issue was such that witnesses were able to testify regarding the drug's possible effects. Although the witnesses' statements concerning such effects were somewhat in conflict, the jury could weigh the evidence and decide what testimony to credit. Neal, therefore, does not provide the Defendant-Appellant with relief.

The State further argues that the evidence is relevant and not unfairly prejudicial. According to the State, the evidence is relevant when considered in conjunction with expert testimony that Tramadol (1) amplifies the effect of alcohol, (2) should not be taken with alcohol, (3) carries a warning to beware of operating a motor vehicle while using it, and (4) has a depressing effect on the nervous system. As such, the fact that the defendant had Tramadol in her blood at the time of the collision is highly relevant to her level of intoxication, which the State was required to prove on the charge of vehicular homicide by intoxication. Tenn. Code Ann. § 39-13-213 (a)(2). The State asserts that the evidence is not unfairly prejudicial because Agent Harrison testified to the exact quantity of Tramadol he measured in the Defendant-Appellant's blood, .23 micrograms per milliliter. He testified to the effects of this amount and lesser amounts. The State maintains that this evidence "allowed the jury to infer without speculation that the presence of Tramadol in the defendant's blood supported the conclusion that she was intoxicated at the time of the offense." We agree with the State.

_____

[2] The Defendant-Appellant relies on Neal "and the cases cited in Neal," referring to State v. McClain, 525 So.2d 420 (Fla. 1988), and State v. Albert L. Norton, No. 03C01-9707-CR-00270, 1999 WL 508654 (Tenn. Crim. App., at Knoxville, July 20, 1999). Neal discusses both cases at length and distinguishes them because the quantity in question was not a trace amount and witnesses could describe the possible effects on a person of such quantities. Robert S. Neal, 2002 WL 31852854, at *18. The Defendant-Appellant's case is distinguishable from McClain and Albert L. Norton for the same reasons.

The test results are relevant to the issue of the Defendant-Appellant's intoxication at the time of the collision. They are also not unfairly prejudicial to the Defendant-Appellant, as nothing about the evidence invites the jury to decide the case on an improper basis. Witnesses for both the State and the defense were able to, and actually did, testify concerning the test results and the possible effects of the amount of Tramadol in the Defendant-Appellant's blood. As a result, the trial court did not abuse its discretion in admitting this evidence. The Defendant-Appellant is not entitled to relief on this issue.

**II. Mistrial.** The Defendant-Appellant argues the trial court erred in not granting a mistrial following the removal of her mother from the courtroom during the trial. Specifically, the Defendant-Appellant claims that "her mother became emotional, causing a great disturbance in the courtroom, ultimately falling to the floor. She had to be carried or dragged out of the courtroom, all in front of the jury." She argues that this behavior "prejudiced the whole trial." The State maintains the trial court properly denied the mistrial. We agree with the State.

The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Id. (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). This Court will not reverse the trial court's denial of a motion for mistrial "absent a clear showing that the trial court abused its discretion." Robinson, 146 S.W.3d at 494 (citing State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002)). The party seeking a mistrial has "the burden of establishing the necessity of a mistrial." Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388).

Regarding the outburst during Defendant-Appellant's cross-examination at trial, the transcript reflects the following:

[Defendant-Appellant]: Can I quit?

[The State]: I'm sorry?

The Court: No.

[The State]: Do you need some water?

The Court: Do you need some water?

[Defendant-Appellant]: No.  I just –

[The State]: Please.  If she needs a break, Your Honor, she can have a break.

The Court: We – we can take a –

Lady in the Audience: Yeah, she needs a break.  You need to –

The Court: Wait just a minute, ma'am.

Lady in the Audience: – quit doing what you're doing to her.

[Defendant-Appellant]: Mama, ssh.

The Court: Ma'am?

Lady in the Audience: She needs a fucking break.

[Defendant-Appellant]: Mama, ssh.

Lady in the Audience: I can take (unintelligible).

The Court: Would you take her out of the courtroom, please?

(The lady fell to the floor crying.)

The Court: Let's take a break.  Members of the jury, step out, please.

(The lady continued crying as the jury left the courtroom.)

After a recess, the jury returned and the State completed its cross-examination of the Defendant-Appellant.  After the following witness's testimony and a lunch recess, the Defendant-Appellant moved for a mistrial.  The Defendant-Appellant argued:

[B]efore lunch, my client's mother, you know, had a temper attack in the – in the courtroom.  As a result of that, she was dragged out of the courtroom in front of the jury.  That's highly prejudicial to my client. . . . I've got to ask for a mistrial.  I don't know how you ask for a mistrial when it's someone in your camp that does it, but at the same time, it – it's still prejudicial to my client.

The State responded, "Your Honor, we would oppose a mistrial. This was conduct created by the defendant's mother. I don't think there's been an outlet of who the – who this individual was, or what she said, anything to prejudice the jury."

The trial court denied the Defendant-Appellant's motion and stated:

> Well, having a person become vocal and disruptive in the Court, it's something we don't like to see, but it happens. But I don't think, under the circumstances of this case, that it would be so prejudicial as to cause Ms. Galyean here to not receive a fair trial. I believe this jury recognized what happened. The – this is the way I understand it, the mother of the accused, while the accused was on the stand, became upset and vocal, and I asked her to leave; and then she started crying and was helped out in the aisle, and she, the best I could tell, just sort of squatted down, or fell down, and the court officers and other people here in law enforcement assisted her out. But by no means was she drug out the door, in the sense of her dragging her feet. She was helped out the door. And I – I don't think that that conduct would be viewed by the jury as detrimental to the accused in any way, certainly not to the extent that she'd be denied a fair trial. So I'd deny your motion for a mistrial.

When the jury returned to the courtroom, the trial court addressed the jury regarding this matter. It stated:

> Before lunch, and during the testimony of the last witness, there was, I guess what we might call a disturbance in the sense that one of the – and I may be mischaracterizing, but I think maybe Ms. Galyean's mother became vocal. I certainly want you to understand that that should not in any way be held against the accused in this case. It's not an unusual happening. And I think we can all understand the emotions of the moment, and that should not in any way impact or influence your decision in this case. One, it wasn't evidence; two, it has nothing to do with the outcome of the trial.

On appeal, the Defendant-Appellant contends that the court's curative instruction was insufficient to relieve her of the prejudice caused by the disturbance. The State responds that the Defendant-Appellant has offered no evidence of any prejudice that resulted from her mother's actions. Additionally, the State argues that the trial court's instruction to the jury cured any prejudice that may have resulted.

The record supports the trial court's decision. The Defendant-Appellant has not stated any reason why the disturbance caused prejudice, nor has she made a clear showing that the trial court abused its discretion. See Robinson, 146 S.W.3d at 494 (citing State v. Reid, 91

S.W.3d 247, 279 (Tenn. 2002)). Furthermore, the trial court instructed the jury regarding the disturbance, and we must presume that the jury followed this instruction. See State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001) (holding there is a presumption that the jury follows curative instructions). As a result, the Defendant-Appellant is not entitled to relief on this issue.

**III.  Sentencing**.  In three sentences in her brief to this Court, the Defendant-Appellant argues the trial court "incorrectly applied the enhancing factors and failed to apply the mitigating factors" in imposing the eleven-year sentence.  She claims that her sentence "is not justified by the proof in this case."  In response, the State contends that this issue is waived because the Defendant-Appellant has failed to cite (1) any authority supporting her contention or (2) appropriate references to the record.  Alternatively, the State argues that the sentence was properly based on a consideration of the principles of sentencing.

We agree with the State that Defendant-Appellant has failed to cite either supporting authority or to the record in her argument regarding this issue.  Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."  Failure to comply with this basic rule will ordinarily constitute a waiver of the issue.  Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (determining that issue was waived where defendant cited no authority to support his argument on appeal).  Although the failure to cite authority or the record is a basis for waiver, we choose to address this issue on the merits.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006).  Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006). The defendant has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d), Sentencing Commission Comments. Moreover, the statutory sentencing guidelines directing a trial court's decision are advisory, and the weight to be assigned any applicable enhancement or mitigating factor is in the discretion of the trial court. Id. § 40-35-210(c); State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). An appellate court will not reweigh these factors. See Carter, 254 S.W.3d at 344-45.

Because the record in this case reflects that the trial court properly considered the sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption of correctness. See Ashby, 823 S.W.2d at 169.

The trial court thoroughly addressed the enhancement and mitigating factors applicable to this case during the sentencing hearing. It determined that enhancement factor 10 applied. See T.C.A. § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high"). Regarding this enhancement factor, the court stated, "I think that is applicable and significantly so. Again, driving under the influence of an intoxicant on the highway is a huge factor. Not only victims here, but those, as we have mentioned, who were on the highway." The court further based its sentencing decision generally on a need for deterrence, the Defendant-Appellant's refusal to admit a problem with alcohol, and the fact that she was charged with another DUI while awaiting the trial on the instant charges. As a result, the trial court sentenced the Defendant-Appellant to eleven years' incarceration for vehicular homicide by intoxication and four years and six months for each vehicular assault offense.

The Defendant-Appellant has failed to carry her burden to demonstrate the impropriety of the eleven-year sentence based on a misapplication of enhancement and mitigating factors. The trial court stated its findings regarding all the enhancement and

-16-

mitigating factors that the parties raised, and it found that enhancement factor 10 applied based on evidence that other drivers were on the Interstate when Defendant-Appellant committed this offense. See, e.g., State v. Gabriel Cordova Delarosa, No. E2008-01940-CCA-R3-CD, 2010 WL 454806, at *5 (Tenn. Crim. App., at Knoxville, Feb. 10, 2010) (applying enhancement factor 10 to conviction of vehicular homicide by intoxication when there was evidence that the defendant's driving "placed other motorists in jeopardy") perm. to appeal denied (Tenn. Apr. 22, 2010 and Nov. 17, 2010). It sentenced Defendant-Appellant accordingly, in light of this factor and all other sentencing considerations. The eleven-year sentence properly fell within the applicable statutory range. See T.C.A. § 39-13-213(a)(2), (b)(2) (2006) (classifying vehicular homicide by intoxication as a Class B felony); T.C.A. § 40-35-112(a)(2) (2006) (providing for a penalty of eight to twelve years for a Range I, Class B felony offense). The Defendant-Appellant is not entitled to relief on this issue.

Although Defendant-Appellant does not raise the issue, we are compelled to note that the trial court erred in sentencing Defendant-Appellant to four and a half years for each of the vehicular assault convictions. This sentence exceeds the applicable statutory range of two to four years for a Range I offender convicted of a Class D felony. See T.C.A. 39-13-106(b) (classifying vehicular assault as a Class D felony); T.C.A. § 40-35-112(a)(4) (providing for a penalty of two to four years for a Class D felony under Range I). Consequently, we modify the judgment forms to reflect a sentence of four years for each of the vehicular assault convictions.

## CONCLUSION

Upon review, we affirm the judgments of the trial court as modified and remand for entry of corrected judgments as to the vehicular assault convictions.

_____
CAMILLE R. McMULLEN, JUDGE